UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,             Criminal Case No. 13-20487

    v.

                                          Hon. Gershwin A. Drain

THOMAS RODELL-HAROLD MILLS,

                    Defendant.

_____/

## THOMAS MILLS'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE

The COVID-19 pandemic is devastating the Bureau of Prisons. In short order, more than 7,310 incarcerated people and 793 staff members have contracted the virus.[1] Ninety-four incarcerated people and one staff member have died.[2] The spread of the virus is not under control.

Thomas Rodell-Harold Mills is particularly vulnerable as an obese Black man who has hypertension and asthma. He respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i): (1) for a compassionate release order reducing his sentence to time served because his medical condition renders him particularly susceptible to complications from COVID-19; (2) that the remaining period of his 36-month sentence

---

[1] Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited July 7, 2020).
[2] *Id.*

be converted to home confinement as a condition of supervised release; and (3) that he be allowed to quarantine at home for the recommended fourteen days instead of remaining at the BOP facility. In the alternative, he asks for a judicial recommendation for home confinement under 18 U.S.C. § 3624(c)(2), as extended by the CARES Act § 12003(b)(2).

## BACKGROUND

While serving a term of supervised release, police found Mr. Mills with a firearm, and he was charged in federal court. That case was assigned to Judge Victoria A. Roberts. There were no allegations of violence for this underlying offense. Police approached Mr. Mills and his friend at a car wash, he removed the gun from his waistband, tossed it, and calmly walked away. (PSR ¶ 11.) Mr. Mills accepted full responsibility for his conduct, and Judge Roberts sentenced him to serve a three-year term of incarceration to be followed by a two-year term of supervised release. *United States v. Mills*, No. 17-cr-20698, Dkt. # 17, PgID 73–74.

Subsequently, Mr. Mills accepted responsibility for violating the conditions of his supervised release. This his Court sentenced him to serve 12 months' imprisonment consecutive to Judge Roberts's three-year sentence with no supervision to follow. (R. 39, SVR Judgment, PgID 127.)

Mr. Mills has served 65% of his aggregate sentence. (Ex. A, Inmate Data at 4) The BOP anticipates his release on February 25, 2021. He will be eligible for home detention on October 3, 2020. Mr. Mills's case manager informed him that he is

scheduled to be released to a halfway house at the end of August or beginning of September 2020.

## LEGAL STANDARD

Under the First Step Act of 2018 (1SA), this Court can and should reduce Mr. Mills's sentence. Compassionate release is appropriate when: (1) "extraordinary and compelling reasons warrant" reduction; and (2) the reduction is consistent with Sentencing Commission "policy statements" found in U.S.S.G. § 1B1.13. *See* 18 U.S.C. § 3582(c)(1)(A). The Commission set forth three categories qualifying as extraordinary and compelling: terminal medical conditions, medical debilitation, and family circumstances. U.S.S.G. § 1B.13 cmt.1(A)–(C). Recognizing these categories might not encompass all compelling reasons, the Commission added "other reasons"—which may act "in combination" with the other categories or be wholly independent. *See* U.S.S.G. § 1B1.13 cmt.1(D).

But these policy statements were last revised before the 1SA, and so "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the [1SA]."[3] The 1SA broadened courts' discretion to use Application Note 1(D) of U.S.S.G. § 1B1.13 to decide what "extraordinary and compelling

---

[3] *United States v. Beck*, 425 F. Supp. 3d 573, 579–80 (M.D.N.C. 2019); *see also United States v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) ("[T]he Commission never harmonized its policy statement with the [1SA]."); *United States v. Gagne*, 2020 WL 1640152, *2 (D. Conn. Apr. 2, 2020), appeal pending, No. 20-1169 (2d Cir.).

circumstances" are[4] and if compelling reasons other than age, medical conditions, or family circumstances exist.[5]

## ARGUMENT

COVID-19 is ravaging the BOP. People in federal custody cannot take appropriate hygienic and social-distancing measures to protect themselves from infection. These are extraordinary times. And Mr. Mills's health conditions make him particularly vulnerable.

## I. Mr. Mills has exhausted administrative remedies and 30 days have passed

An incarcerated person may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier.*" 18 U.S.C. of § 3582(c)(1)(A) (emphasis added).

More than 30 days have passed since Mr. Mills first requested compassionate release. On May 11, 2020, Mr. Mills petitioned the warden for consideration for

---

[4] *United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020); *accord United States v. Redd*, 2020 WL 1248493, *6 (E.D. Va. Mar. 16, 2020); *United States v. Bradshaw*, 2019 WL 7605447, *3 (M.D.N.C. Sept. 12, 2019).

[5] *See, e.g., United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[A] court may find . . . that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . ."); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) (same); *United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) (same).

4

compassionate release. (Ex. B, Request) His request was rejected the same day. (*Id.*) More than 30 days have passed since he submitted the request, so this Court has the power to consider and grant the motion.

## II.   The COVID-19 Pandemic and Mr. Mills's Health Conditions Are Reasons to Grant Compassionate Release

Mr. Mills's longstanding asthma, high blood pressure, body mass index (BMI), and race put him at increased risk of severe complications from COVID-19, up to and including death. These conditions and his continued incarceration during this pandemic "substantially diminish[] the ability of [Mr. Mills] to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).[6] These circumstances are also "extraordinary and compelling." *See* U.S.S.G. § 1B1.13 cmt.1(D).

The COVID-19 pandemic is an unprecedented health crisis. COVID-19 is an extremely dangerous viral respiratory illness caused by a novel coronavirus.[7] The best estimate for its overall fatality rate "is 5–35 times the fatality associated with influenza

---

[6] *United States v. Atkinson*, 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) ("The presence of COVID-19 . . . necessitates a more expansive interpretation of what self-care means"); *United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *2 (E.D. Mich. May 21, 2020) (Edmunds, J.); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (Hood, C.J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093 (E.D. Mich. May 11, 2020) (Leitman, J.); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (Levy, J.).

[7] *See* CDC, *What you need to know about coronavirus disease 2019 (COVID-19)*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last visited July 7, 2020); *see also* NewScientist, *Covid-19* (Apr. 14, 2020), available at https://www.newscientist.com/term/covid-19/.

infection." (Ex. C, Beyrer Dec. ¶ 5.)[8] A person's likelihood of dying from this disease varies depending on two key factors: (1) their demographic profile and (2) the environment where they live. Mr. Mills is particularly vulnerable.

## A. COVID-19 and Mr. Mills's health and demographics put him at risk

*Hypertension.* Mr. Mills suffers from hypertension, which is categorized as a regular blood pressure above 120/80.[9] At his most recent visit to the medical department, Mr. Mills's blood pressure was 133/97 and 155/109. (Ex. D, Medical Records, MILLS_051.) To manage his high blood pressure, Mr. Mills is prescribed Amlodipine (5 mg) and Hydrochorothiazide (25 mg) (*Id.*, MILLS_055.) During visits to health services on May 1, 2020, and April 26, 2020, he reported having headaches nearly every day. (*Id.*, MILLS_52, 57.)

Mr. Mills's hypertension renders him more susceptible to COVID-19. Although the CDC does not specifically list hypertension as a risk factor for a severe case of COVID-19,[10] evidence is mounting that high blood pressure is the most common

---

[8] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26(6) EID Journal (June 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[9] Nancy A. Anoruo, M.D., M.P.H., *Having high blood pressure may make coronavirus more dangerous*, ABC News (Jun. 1, 2020), https://abcnews.go.com/US/high-blood-pressure-make-coronavirus-dangerous/story?id=70991996.

[10] *See* CDC, *People Who Are at Higher Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed May 29, 2020).

comorbidity for persons admitted to the hospital in the U.S. for COVID-19 treatment.[11]

In one study, 63% of patients with COVID-19 in the ICU had baseline hypertension.[12]

The CDC also analyzed clinical COVID-19 data from China and concluded that case

fatality was higher for patients with hypertension.[13] Of patients in China with no

reported underlying medical conditions, the case fatality rate was 0.9%; for those with

hypertension, the case fatality rate was approximately 6%.[14] Recognizing this research,

on June 25, 2020, the CDC updated its guidance to people of any age to reflect research

showing that "[h]aving other cardiovascular or cerebrovascular disease, such as

hypertension (high blood pressure) or stroke, may increase your risk of severe illness

from COVID-19."[15]

---

[11] *See* Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, J. of the Am. Med. Ass'n (Apr. 22, 2020) (listing hypertension as the most common comorbidity, present in 56.6% of cases studied), available at https://jamanetwork.com/journals/jama/fullarticle/2765184 ("New York City Study"); Ex. D, Goldenson Decl. ¶ 28a & n.12; Ex. F, Amon Decl. ¶ 8.

[12] Nancy A. Anoruo, M.D., M.P.H., *Having high blood pressure may make coronavirus more dangerous*, ABC News (Jun. 1, 2020), https://abcnews.go.com/US/high-blood-pressure-make-coronavirus-dangerous/story?id=70991996.

[13] *See* CDC, *Interim Clinical Guidance for Management of Patients with Coronavirus Disease (COVID-19)*, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited July 7, 2020) (listing hypertension as condition "associated with increased illness severity and adverse outcomes").

[14] *Id.*

[15] CDC, *People Who Need Extra Precautions: People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (last visited July 6, 2020).

7

For these reasons, numerous have concluded that the combination of hypertension, COVID-19, and a custodian setting create "extraordinary and compelling reasons" to grant compassionate release.[16]

**Asthma.** Mr. Mills has also struggled with asthma since childhood. (PSR ¶ 63.) That struggle continues today; doctors continue to prescribe him an Albuterol Inhaler. (Ex. D, Medical Records, MILLS_90.)

Asthma is an incurable respiratory disease. The American Academy of Allergy Asthma and Immunology explains, "[i]f you have asthma your airways are always inflamed. They become even more swollen and the muscles around the airways can tighten when something triggers" symptoms "mak[ing] it difficult for air to move in and out of the lungs."[17] When this happens, an asthmatic person experiences coughing, wheezing, shortness of breath and/or chest tightness.[18] "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and

---

[16] *See, e.g.*, *United States v. Ullings*, No. 1:10-cr-00406, 2020 WL 2394096 (N.D. Ga. May 12, 2020) (hypertension and obesity); *United States v. Foreman*, No. 3:19-cr-62 (VAB) 2020 WL 2315908 (D. Conn. May 11, 2020) (hypertension and obesity); *United States v. Quintero*, No. 08-CR-6007L, ___ F.Supp.3d ___, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (diabetes, a compromised immune system, obesity, and hypertension).

[17] Asthma Overview, AAAAI, https://www.aaaai.org/conditions-and-treatments/asthma (last visited July 7, 2020).

[18] *Id.*

8

possibly lead to pneumonia and acute respiratory disease."[19] Because of the heightened risks of a COVID-19 infection that asthmatics face, numerous courts have granted compassionate release to those with asthma.[20]

**Body Mass Index.** A BMI that is above 29.9 moves an individual from a category of overweight to obese. Standing 5'9" and weighing 246.0 lbs., Mr. Mills's BMI is 34.3.[21] (Ex. D, Medical Records, MILLS_072.)

The CDC's initial list of risk groups identified severely obese people, those with a BMI of 40 or above, as particularly at a higher risk for COVID-19. But recent medical data shows that people like Mr. Mills who are considered obese but have BMIs lower than 40 are also at increased risk. People under 60 years old, with a BMI between 30 and 34, were twice as likely to need acute medical care related to COVID-19 than those with a BMI less than 30.[22] Further, these same people were 1.8 times more likely to

---

[19] CDC, *People Who Need Extra Precautions: People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#asthma (last visited July 7, 2020).

[20] *See, e.g.*, *United States v. Gorai*, 2020 WL 1975372, at *3 (D. Nev., Apr. 24, 2020) ("[D]efendant's asthma falls squarely within the ambit of preexisting conditions that the CDC has unambiguously explained place him at greater risk of COVID-19"); *United States v. Norris*, No. 3:18-cr-243, Dkt. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting *possible* positive case at institution).

[21] *See* Nat'l Heart, Lung & Blood Inst., *Calculate Your Body Mass Index*, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi-m.htm.

[22] Jennifer Lighter, et al., *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (2020), available at https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333.

need care in an Intensive Care Unit than those with BMIs under 30.[23] Accounting for this evidence, on June 25, 2020, the CDC added having a BMI over 30 to the list of risk factors for people of any age.[24]

Recognizing that "obesity is among the risk factors with the strongest and most consistent evidence of increasing a person's risk of severe illness from COVID-19," Judge Tarnow recently granted compassionate release to a man who had a BMI of 32.3,[25] which is lower than Mr. Mills's.

**Race.** Mr. Mills is a Black man. The CDC's data suggests "a disproportionate burden of illness and death among racial and ethnic minority groups."[26] A report detailing data gathered from 580 patients hospitalized with lab-confirmed COVID-19 found that 33% of hospitalized patients were Black compared to 18% in the community. *Id.* Where race and ethnicity data were available for those who died of COVID-19, New York City found death rates among Black people (92.3 deaths per 100,000 population) and Hispanic/Latino persons (74.3) that were substantially higher

---

[23] *Id.*

[24] CDC, People Who Need Extra Precautions: People of Any Age with Underlying Medical Conditions (June 25, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (updated June 25, 2020 to reflect data available as of May 29, 2020).

[25] *Cotton v. United States of America*, No. 2:16-cr-20222, Dkt. #443, Op. & Order, PgID 4045.

[26] CDC, *COVID-19 in Racial and Ethnic Minority Groups*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last accessed June 4, 2020).

than that of white (45.2) or Asian (34.5) persons.[27] Numerous articles have detailed the racial disparities of COVID-19 in America.[28]

In addition, the CDC reports that non-Hispanic Black persons have a rate of hospitalization due to COVID-19 that is five times that of non-Hispanic white persons.[29]



Although researchers still do not know why COVID-19's mortality rate is higher among Black Americans, at least one court has suggested race is a factor to consider.[30]

---

[27] *Id.*

[28] *See, e.g.*, Linda Villarosa, '*A Terrible Price:' The Deadly Racial Disparities of Covid-19 in America*, N.Y. Times Magazine (Apr. 29, 2020), *available at* https://www.nytimes.com/ 2020/04/29/magazine/racial-disparities-covid-19.html.

[29] CDC, *Other People Who Need Extra Precautions: Racial & Ethnic Minority Groups*, https:// /www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic- minorities.html (last visited July 6, 2020).

[30] *See Essien v. Barr*, No. 20-CV-1034-WJM, 2020 WL 1974761, at *7 (D. Colo. Apr. 24, 2020) (noting that a 55-year-old black man, was at higher risk of experiencing severe complications from COVID-19 in ordering his early release from prison).

**B. COVID-19 poses acute risks to people in custody**

Epidemiologists know that detention facilities are "associated with high transmission probabilities for infectious diseases." (Ex. C, Beyrer Decl. ¶ 11.)[31] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[32] When outbreaks occur in prisons, contagion spreads beyond the confines of jail. (*See id.* ¶ 12.) "It is therefore an *urgent priority* in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." (*Id.* ¶ 17 (emphasis added).)

The numbers of positive-COVID-19 cases in BOP escalated and continue to increase exponentially. And there is considerable evidence that the numbers publicly reported by the BOP undercount the number of incarcerated people actually infected. BOP facilities that implemented testing saw dramatic increases in the number of cases.[33] For example, after Judge Gwin forced officials at FCI Elkton to begin testing people en masse, the number of positive cases jumped from 137 active cases among incarcerated people on May 19, 2020, to 424 on June 3, 2020. That's over 300 new cases in just two weeks. Even by the BOP's count, the infection rate in the BOP is much

---

[31] *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):1047-1055 (2007), available at https://doi.org/10.1086/521910.

[32] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[33] *See, e.g.*, Walter Pavlo, *After Seeing Federal Bureau of Prisons Up Close, Federal Judges May See Sentencing Differently in Future*, Forbes (May 3, 2020), shorturl.at/dtN89; Luke Barr, *70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020), shorturl.at/ayLRZ.

faster than the national rate:[34]

### COVID-19 Rate of Infection for Various Populations

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| BOP Imprisoned Population | 6,863[35] | 144,776[36] | 47.40 | 4.7404% |
| United States | 2,724,640 | 329,886,925[37] | 8.26 | 0.8259% |
| China | 84,825[38] | 1,394,015,977[39] | 0.06 | 0.0061% |
| Italy | 240,961[40] | 62,402,659[41] | 3.86 | 0.3861% |

| | BOP has an infection rate X times higher |
|---|---|
| Compared to the United States | 5.82 |
| Compared to China | 779.04 |
| Compared to Italy | 12.28 |

Part of the problem is that the BOP fails to follow its own policies consistently.

---

[34] Charts available at https://federaldefendersny.org/ (last visited June 4, 2020).

[35] Includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis.

[36] Includes the number of federal inmates in BOP-managed institutions, the number of federal inmates in community-based facilities, and the number of federal inmates who have died from COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis.

[37] Numbers obtained on 7/02/2020 at 5:13pm from https://coronavirus.jhu.edu/map.html.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

13

Staff who should be quarantined after exposure aren't.[42] Prisons fail to stock basic essentials like soap.[43] The situation is so poor that a union representing 30,000 BOP employees has filed an OSHA complaint because "staff who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[44]

The Department of Justice has documented how the BOP has struggled to provide adequate medical care even in the best of times.[45] In recent years, the BOP has been starved of resources, leaving it understaffed.[46] Even the BOP has acknowledged, the risks of the rapid transmission of contagion in the tight quarters of prisons and jails

---

[42] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020), available at: https://bit.ly/2VkWuTC.
[43] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020), available at https://on.wsj.com/3a4TD6K.
[44] *See* OSHA Complaint, https://www.afge.org/globalassets/documents/ generalreports/coronavirus/4/osha-7-form-national-complaint.pdf. The situation has worsened since the plaintiffs filed this complaint. Inmate movement across BOP and local detention centers—one of the central OSHA complaints—continues.
[45] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/ 2016/e1602.pdf (the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them).
[46] *See Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer, Director, Fed. Bureau of Prisons).

present major challenges in keeping incarcerated people and staff safe and healthy.[47]

These circumstances are extraordinary and compelling even if, according to the BOP, there are presently no active cases of COVID-19 amongst staff or incarcerated people at Ray Brook FCI. "Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases."[48]

As recently as July 6, 2020, there were still active cases. On June 8, 2020, the BOP reported that one incarcerated person had a confirmed case of COVID-19 at Ray Brook FCI. That number remained steady until June 12, 2020, when the BOP reported four confirmed cases among incarcerated people. (*See* Ex. G, Screenshots of BOP Website for 6/4 & 6/8–6/12) Since then, two people have recovered, and now there confirmed cases of COVID-19 amongst incarcerated people at Ray Brook FCI. On June 19, 2020, the BOP reported that one staff member tested positive. Based on information reported by the BOP, it appears that person was considered "recovered" by June 30, 2020.

But these numbers do not show the whole picture. More telling is the BOP's public information about the number of COVID-19 tests performed at Ray Brook FCI. Only 54 people have been tested for the virus there, and 11 of those tested were positive

---

[47] *See* Fed. Bureau of Prisons, Program Statement 6190.04: Infectious Disease Management (2014).
[48] *Amarrah*, 2020 WL 2220008, at *6.

for the virus—approximately one fifth of those tested.[49] There are no test results

pending right now, which means we cannot know if there are, in fact, no cases of

COVID-19 in Ray Brook FCI.

Courts have not hesitated to grant home confinement even in facilities without

confirmed cases because the realities of prison life make it impossible for medically

vulnerable inmates like Mr. Mills to follow CDC guidelines to protect themselves in the

face of COVID-19.[50] At Ray Brook FCI, people are crammed into "four-person cells

that are 'about the size of a common fast-food restaurant bathroom.'"[51] Although nearly

two months have passed since The Appeal's initial reporting, the conditions that make

the prison a tinderbox for infection have not have not changed.

## C. Mr. Mills has good cause for concern about the safety of his children

One of the reasons he should be home: the mother of his kids is a healthcare

worker in the triage unit, where she encounters, tests, and treats people infected with

the novel coronavirus. Healthcare workers on the frontline of this crisis have been the

---

[49] BOP, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/ (last visited July 7, 2020).

[50] *See, e.g.*, *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released.").

[51] Harry August & Alex Garnick, *The Situation Here Is Dire': How an Upstate New York Prison Failed to Contain a COVID-19 Outbreak*, The Appeal (Apr. 16, 2020), https://theappeal.org/coronavirus-upstate-new-york-prison-failed-to-contain-outbreak/.

16

virus's most common victim. By mid-April 2020, nearly 9,300 U.S. healthcare workers contracted COVID-19.[52] "The CDC researchers acknowledge the figures are almost certainly a substantial undercount because most of the people tested in the overall data set (84%) didn't say whether they're a health care worker or not."[53] Home confinement would allow Mr. Mills to care for his children until this crisis subsides and minimize their potential exposure to COVID-19.

### D. Mr. Mills has a release plan

Mr. Mills enjoys the love and support of family who will help him succeed if he is released early. For the past three years, he has been in a relationship with Courtney Johnson. They have a two-year-old daughter together and plan to marry when he is released. Ms. Johnson works as a medical assistant in Ann Arbor and is in the process of starting a business. (*See* Ex. H, Courtney Johnson Ltr.)

If released, however, Mr. Mills will not have to rely on the success of a new business to support himself. Ms. Johnson's father does work as a handyman and has offered Mr. Mills a job if he returns. (Ex. I, Robert Johnson Ltr.) Mr. Mills also enjoys the support of his uncle, Shawn McLendon, who works at a factory that hires people who have been convicted of felonies. He has offered to help Mr. Mills apply for work

---

[52] Blake Farmer, *At Least 9,000 U.S. Health Care Workers Sickened With COVID-19, CDC Data Shows*, NPR (Apr. 15, 2020), https://www.npr.org/sections/health-shots/2020/04/15/834920016/at-least-9-000-u-s-health-care-workers-sickened-with-covid-19-cdc-data-shows.

[53] *Id.*

there. And, if that does not work, then Tanesha Green, Mr. Mills's cousin, plans to connect him with At Work, the temporary agency through which she found work at one of Cadillac's planting factories.

Mr. Mills also has a place to live. If released, Mr. Mills plans to live with Ms. Green on Hayes Street in Detroit, Michigan. Ms. Green lives in this home with her two children who are 18 and 8 years old. She owns a four-bedroom home, and she has offered Mr. Mills one of the bedrooms.[54] Ms. Green fully understands the necessity of social distancing and will ensure that Mr. Mills will adhere to the CDC's and governor's guidance.

**E. The sentencing factors in 18 U.S.C. § 3553(a) favor Mr. Mills's release**

Given that Mr. Mill will be eligible for release to home detention on October 3, 2020, the question is whether an additional three months in prison will serve the objectives of punishment. Retribution, deterrence, incapacitation, and rehabilitation, see 18 U.S.C. § 3553(a), do not justify Mr. Mills's continued incarceration in unsanitary

---

[54] Ms. Johnson currently lives across the street from a school, but plans to move to reunite the family. Mr. Mills was convicted of a sex offense in 2001. But he is a class member represented by the ACLU in ongoing litigation about the validity of Michigan's Sex Offender Registration Act. The Sixth Circuit and Judge Cleland has found that the Act violates the Ex Post Facto Clause for class members, and is therefore unconstitutional. The residency restrictions are also unconstitutional. *See generally Doe v. Snyder*, No. 2:16-cv-13137, Dkt. #84, PgID 1777–1808 (E.D. Mich.). In April, he enjoined the enforcement of the Act during the COVID-19 pandemic. *Id.*, Dkt. #91, PgID 1847–51. Out of an abundance of caution, Mr. Mills has made alternative living arrangements so as not to be in violation of any state or federal law.

18

lockdown conditions without access to programming for the next three months are
few.

**Retribution & Deterrence.** The conditions of incarceration are inherently
intertwined with the question of what punishment is just for this supervised release
violation. Mr. Mills will spend whatever time left there is to serve in harsher-than normal
conditions.

In addition to the conditions that make social distancing nearly impossible,
Mr. Mills is isolated indoors in his cell nearly all the time. Since March 13, 2020, BOP
"modified its operations" to respond to the spread of COVID-19.[55] Under this plan
people "in every institution" are "secured in their assigned cells/quarters to decrease
the spread of the virus."[56] Family and friends are prohibited from visiting.[57]
Programming, absent select UNICOR operations, has ceased and movement

---

[55] Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020),
https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's
modified operations were extended as described in Phase III, Phase IV, Phase V, Phase
VI, and Phase VII.

[56] Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently
extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase
VII). And, at some facilities, once someone tests positive for the virus, they are put in
solitary confinement. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-
04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales)
(petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19);
Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc2088-
FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane
Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive
for COVID-19).

[57] Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/
coronavirus/covid19_status.jsp (last visited July 6, 2020).

throughout the facility is suspended.[58] And while BOP's website claims people are permitted to move for showers three times a week, telephone and email access, commissary, and laundry,[59] in reality, even these basic activities are often not allowed.[60] Conditions amount to a "total lockdown" nearly all day long.[61]

---

[58] *Id.*

[59] *Id.*

[60] *Torres*, ECF No. 1, at 8 (Lompoc); *See also, e.g.*, Mem. From B. von Blanckensee, Acting Complex Warden FCC Lompoc, to All Staff at FCC Lompoc (Apr. 17, 2020) ("no phone or computer access"), https://bit.ly/3cdgA8H, *Hallinan*, ECF No. 1-4, at 3-4 (Decl. of Roger Duane Goodwin) ("Our unit [in FCI Butner Medium] remains locked down. . . except for about 1 hour on weekdays, when we are allowed to take a walk outside of our unit."); *Torres*, at 22-28 (describing crowded, unsanitary conditions); *Torres*, at 56 (Declaration of Joanna Perales) ("prisoners were not allowed to shower" and "once [prisoners] run out of soap, they cannot purchase any more because the commissary is closed"); *id.* at 59-60 (Decl. of Graciela Zavala-Garcia) ("my son was denied all access to telephones, email and commissary" and "my son has not been able to shower or change into clean clothes"); Class Action Complaint, *Wilson v. Ponce*, No. 20-cv04451 (C.D. Cal. May 16, 2020), ECF No. 1, at 82-83 (Decl. of Jackeline Vazquez) (describing the crowded and unsanitary living conditions at FCI Terminal Island and declaring that "my brother was told that prisoners would not be able to use phones and computers until further notice"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3-4 (Decl. of Kendal Nelson) ("[At FCI Elkton] They are not allowing us to go outside and get fresh air, and we're not allowed into the law library.").

[61] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); see also Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited July 6, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

Because of COVID-19, any time longer Mr. Mills spends in prison will necessarily be more severe than usual. We cannot know when the next pandemic will occur. But Mr. Mills knows how uniquely miserable life in prison is during these challenging times. This experience will make him pause to think twice before engaging in any criminal activity.

**Incapacitation.** Since this Court imposed judgment, Mr. Mills has taken the time in custody to work on himself. He has not been disciplined at all in the past two years. (Ex. J, Discipline Report.) This fact demonstrates how Mr. Mills has matured in the last three years because this is the first prison sentence he has served without any receiving any discipline. His discipline-free record over the past three years is strong evidence to believe home confinement and supervision will adequately protect the public.

The BOP has relied exclusively on Mr. Mills's PATTERN score to deny earlier release to home confinement. That score should not influence this Court. It is generated by an algorithm created pursuant to the 1SA as a means for the BOP to determine an inmate's "risk of recidivism" in order to provide that inmate with programming commensurate with that score, and allow that inmate to complete the programming as an incentive to receive earned time credits towards early release.[62] But "it is still an

---

[62] Dept. of Justice, *Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation* (Jan. 15, 2020), https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act.

21

incomplete tool [and] it has yet to be independently validated, as required by the First Step Act."[63]  In fact, "many questions remain about PATTERN's validity because of possible racial/ethnic and gender bias and because of the tool's overemphasis on static factors such as criminal history."[64] For these reasons, numerous civil rights groups have urged the Attorney General to stop using PATTERN to assess who should be released during this pandemic.[65] Troublingly, in the past year, the threshold needed to qualify as "minimum" or "low" risk changed substantially—a move that has undercut the Attorney General's promise to reduce to the prison population in this crisis.[66]

*Rehabilitation.* Mr. Mills has also taken numerous programs in an effort to develop the skills he will need to succeed. Those closest to him have witness great personal growth during the last few years. (Ex. H, Courtney Johnson Ltr.; Ex. I, Robert Johnson Ltr.)

---

[63] *See* Nadler & Bass Press Release, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893.

[64] *Id. See generally* Ex. K, David Patton & Jon Sands, Fed. Pub. & Comm'y Defenders Leg. Comm., Letter to Nat'l Inst. of Just. Re: DOJ First Step Act Listening Session on PATTERN (Sept. 13, 2019) (noting, among other things, the disparate impact on Black incarcerated people); Ex. L, David Patton, Statement Before Judiciary Committee of the House of Representative Subcommittee on Crime, Terrorism, & Homeland Security: The FBI & Implementation of the First Step Act at 7–9 (Oct. 17, 2019).

[65] Letter to Attorney Gen. William Barr (Apr. 3, 2020), available at http://civilrightsdocs.info/pdf/policy/letters/2020/Final_Letter_on_PATTERN_in_Response_to_AG_Barr_Memo_on_4_26-4_3_2020.pdf.

[66] Ian MacDougall, *Bill Barr Promised to Release Prisoners Threatened by Coronoavirus*, *supra* at n.21.

While in the BOP, Mr. Mills has taken advantage of numerous programs to reorient his thinking and to prepare him for re-entry into the community. Mr. Mills has completed 20 programs in the past three years. (Ex. M, Mills Transcript) During his previous term of imprisonment, Mr. Mills participated in only seven programs. (*Id.*) More than his previous term of incarceration, Mr. Mills's transcript shows that he has made a concerted effort to develop interpersonal and professional skills so that he can be a productive member of the community. He has received certificates for completing the following courses:

- Personal Development
- Resource Fair Course
- The Man Up Program
- Reentry Support Resources, Problem Solving & Decision Making
- Values Clarification, Goal Setting & Achieving
- Non-Residential Drug Abuse Program
- Anger Management
- The Alternatives to Violence Project

(Ex. N, Certificates)

As Mr. Mills explains, these programs have helped him to reflect on his past behavior and to take responsibility for his actions. He specifically identifies the Alternatives to Violence Project as a program that has taught him how to respond to frustration and disappointment in non-violent ways. (Ex. O, Mills Letter) Mr. Mills has developed the tools to succeed, and he has a support network ready and willing to help him become a productive citizen.

It's unlikely that Mr. Mills will be able to complete any additional programs during that time; the BOP has been under modified lockdown for over two months and suspended all programs. There is no end to the lockdown in sight. To the extent he needs additional assistance, community-based options through the U.S. Probation Department are better positioned to help him develop additional skills. Home confinement will adequately protect the public, minimize the spread of COVID-19, and offer safer conditions for Mr. Mills to manage his health conditions.

### III.    A 14-day Quarantine in BOP Custody Is Not Appropriate

This Court should not subject Mr. Mills to a 14-day quarantine. Placement in "quarantine" does not protect inmates from contracting COVID-19 in prison, because they are still exposed to staff who circulate in and out of the quarantine location, as well as in and out of the prison and the community at large. District courts have properly concluded this "Kafkaesque" 14-day "quarantine" "is neither quarantine nor limited to 14 days."[67] Instead, quarantine involves housing with many other people "in conditions that will inevitably permit the virus to spread."[68] Mr. Mills can effectively self-quarantine at his cousin's home.

---

[67] *United States v. Scparta*, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020); *see also United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (rejecting 14-day quarantine in prison and because home confinement "will be significantly better than Devens FMC"); *United States v. Stephens*, Case No. 1:08-CR-15, Dkt. 719 (W.D. Va. May 6, 2020) (amending the court order so that no quarantine period is required).
[68] *Scparta*, 2020 WL 1910481, at *1.

IV.     **How to Accomplish Mr. Mills's Immediate Release.**

If this Court grants Mr. Mills's motion for compassionate release, the judgment should be specific to effectuate his immediate release. Mr. Mills is currently serving an aggregate 48-month sentence because this Court imposed a 12-month sentence consecutive to the 36-month sentence for Case No. 17-CR-20698.[69] Mr. Mills has served 70% of this aggregate sentence. (Ex. A, Inmate Data) Undersigned counsel contacted the BOP's Designation and Computation Center to determine how to accomplish Mr. Mills's immediate release. According to BOP senior counsel, it seems one order can accomplish this objective as long as it states that both sentences have been reduced to time served and that the defendant should be released immediately.

## CONCLUSION

This Court should grant Thomas Mills compassionate release.

Date:  July 7, 2020                    Respectfully Submitted,


                                       **FEDERAL COMMUNITY DEFENDER**


                                       s/ Colleen P. Fitzharris
                                       Attorney for Thomas Mills
                                       613 Abbott Street, Suite 500
                                       Detroit, Michigan 48226
                                       313-967-5868
                                       E-mail: colleen_fitzharris@fd.org

---

[69] Mr. Mills has also filed a motion for compassionate release with Judge Roberts, which remains pending. *United States v. Mills*, No. 2:17-cr-20698, Dkt. #23.

25

## CERTIFICATE OF SERVICE

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

Date:  July 7, 2020

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Thomas Mills
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

26