UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                      Criminal No. 13-20487

v.                                       Hon. Gershwin A. Drain

Thomas Rodell-Harold Mills,

        Defendant.

_____/

# United States' Response Opposing the Defendant's Request for Compassionate Release

While fleeing a traffic stop, Thomas Mills crashed into a building. When officers searched his car, they found a loaded gun and crack cocaine. He was on supervised release for that offense when he was caught with another loaded firearm. He is now serving time for that violation. In addition to his now three convictions for being a felon in possession of a firearm, Mills has a long history of violence against women—including groping, threatening, punching, and choking women, grabbing women by the hair, and throwing them to the floor. (PSR in Case No. 17-20698, ¶¶ 30, 33, 37). He has sexually assaulted women.

1

He has also failed on several occasions to comply with the Sex Offender Registration and Notification Act (SORNA), and violated every term of probation or supervised release that he has received. (*Id.* at ¶¶ 28–41).

Judge Roberts sentenced Mills to 36 months for being a felon in possession of a firearm. (R. 17: Judgment in Case No. 17-20698). Then, this Court sentenced Mills to 12 months on the violation, and ordered it consecutive to Judge Robert's sentence. (R. 39, Judgment, 127). Mills completed Judge Robert's sentence and began serving his sentence in this case on April 20, 2020. He is expected to be released in early 2021.

Mills does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Mills's potentially heightened risk from Covid-19 based on his medical conditions may qualify as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Mills is not otherwise eligible for release. Mills's firearm offenses and history of brutally abusing women make him a danger to the community, *see* USSG § 1B1.13(2). He has repeatedly carried prohibited firearms and

has fired shots at a passing car on at least one occasion. And the 18

U.S.C. § 3553(a) factors—which the Court must also consider under §

3582(c)(1)(A)—likewise do not support release because the nature and

circumstances of the offense are serious, and his history and

characteristics demonstrate a repeated failure to abide by terms and

conditions placed on him by any court. On balance, the 3553(a) factors

show that he will not stop committing crimes if released.

The Bureau of Prisons has taken significant steps to protect all

inmates, including Mills, from Covid-19. Since January 2020, the

Bureau of Prisons has implemented "a phased approach nationwide,"

implementing an increasingly strict protocol to minimize the virus's

spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447,

2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of

Prisons has assessed its entire population to determine which inmates

face the most risk from Covid-19, pose the least danger to public safety,

and can safely be granted home confinement. As of today's date, this

process has already resulted in at least 6,945 inmates being placed on

home confinement. *See* BOP Covid-19 Website. There is currently only

one inmate with Covid-19 at FCI Ray Brook, where Mills is housed, and

no staff members with the virus. Especially given the Bureau of Prisons'
efforts—and "the legitimate concerns about public safety" from
releasing inmates who might "return to their criminal activities,"
*Wilson*, 2020 WL 3056217, at *11—the Court should deny Mills's
motion for compassionate release.

## Background

In January 2013, a police officer pulled Mills over for speeding. (PSR
¶ 9). Mills kept reaching around the floorboards of the vehicle. (*Id.*).
While the officer was attempting to get Mills's information, Mills sped
away and almost hit the police car. (*Id.* at ¶ 10). Mills did hit another
car and a telephone pole before eventually crashing into a building. (*Id.*
at ¶ 11). When the officers arrested Mills, they found a loaded pistol in
the car and almost two grams of crack cocaine. (*Id.* at ¶ 12). Mills
pleaded guilty to being a felon in possession of a firearm and this Court
sentenced him to 42 months of imprisonment and 3 years of supervised
release. (R. 27: Judgment, 89–90). Mills began supervision in 2016.

On August 12, 2017, while still on supervised release, Detroit police
officers saw Mills standing next to a car drinking tequila at a car wash.
(PSR in Case No. 17-20698 ¶ 11). As the officers pulled up, they saw

4

Mills pull a pistol from his waistband and throw it into the car through a window. (*Id.*). Mills attempted to walk away after that, but was arrested. (*Id.*). The officers recovered the pistol, which was loaded with eight live rounds and had been reported stolen. (*Id.*). Mills was then charged federally. When an ATF agent informed him of the federal charges and told him he needed to turn himself in, Mills told the agent to do his job and fled to Las Vegas, where he was eventually arrested. Mills pleaded guilty to being a felon in possession of a firearm for the third time. Before this case, he had a 2004 felon-in-possession conviction that involved him firing shots at a passing car. (*Id.* ¶ 36). Mills's criminal history also includes four convictions for failing to register as a sex offender, a conviction for criminal sexual conduct, and domestic violence convictions. (*Id.* at ¶¶ 29, 38–40).

Judge Roberts sentenced Mills to 36 months for being a felon in possession of a firearm. This Court subsequently sentenced Mills to 12 months of imprisonment on the supervised release violation. Mills began serving his sentence in Judge Roberts's case on June 21, 2018, and completed it on April 20, 2020. He is currently serving this Court's sentence and is incarcerated at FCI Ray Brook. He is 38 years old. Mills

has requested release, citing the Covid-19 pandemic, his child's

mother's work schedule, and his medical conditions. But Mills does not

meet the qualifications for compassionate release due, in large part, to

his high risk of danger to the community.

**Argument**

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's

spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-

3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a

decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of

Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL

3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its

operations to implement its Covid-19 Action Plan and minimize the risk

of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP

Covid-19 Modified Operations Website. Since then, as the worldwide

crisis has evolved, the Bureau of Prisons has repeatedly revised its

6

plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone

allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times. As of today's date, there is one inmate at FCI Ray Brook with Covid-19. None of the staff members have it. Thirteen inmates have recovered there, and none have died.

## B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020

Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.

Over 6,945 federal inmates have been granted home confinement since

the Covid-19 pandemic began, and that number continues to grow. BOP

Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts

show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, ___

F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19

pandemic. As the Attorney General's directives have explained, the

Bureau of Prisons is basing its home-confinement decisions on several

factors:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-

distancing protocols or other Covid-19-based restrictions on release?

Many inmates—particularly those who have been convicted of serious

offenses or have a lengthy criminal record—been already proven

unwilling to abide by society's most basic norms. It is thus important to

evaluate "how . . . released inmates would look after themselves,"

*Wilson*, 2020 WL 3056217, at *11, including whether a particular

inmate would adhere to release conditions and social-distancing

protocols during the pandemic. If a prisoner would be unlikely to take

release conditions or Covid-19 precautions seriously, for instance, he

would also be far more likely than the general public to contract and

spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it

to marshal and prioritize its limited resources for the inmates and

circumstances that are most urgent. For any inmate who is a candidate

for home confinement, the Bureau of Prisons must first ensure that his

proposed home-confinement location is suitable for release, does not

place him at an even greater risk of contracting Covid-19, and does not

place members of the public at risk from him. It must assess

components of the release plan, including whether the inmate will have

access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.  The Court should deny Mills's request for release.

Mills's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir.

2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and

release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in 18 U.S.C. § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   Mills is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Mills requested compassionate release from the Bureau of Prisons in May 2020, so the government is not raising the issue of exhaustion. Still, compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district

court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Mills relies in part on family circumstances in making his request, arguing that his child's mother is an essential worker and the lives of his children are at risk. (R. 42: Letter, 135–36). The government does not make light of these facts and acknowledges that it is certainly a serious situation. However, courts are generally discouraged from reducing a defendant's sentence for family circumstances unless those circumstances are "exceptional." *United States v. Haj–Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008). Mills's family situation is not exceptional— there are many healthcare workers who continue to work and care for their children during the Covid-19 pandemic.

Nor is the Covid-19 pandemic in general enough to satisfy the requirements here. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Mills and

other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A). *See Raia*, 954 F.3d at 597.

In his supplemental briefing, Mills cites his asthma, hypertension, and obesity as reasons justifying release. To qualify for compassionate release, a condition must be "a terminal illness," or "a serious physical or medical condition." *Id.*, n. 1, (A)(i), (ii). It is true that the CDC considers those with a BMI of 30 or higher to be of greater risk of severe illness from Covid-19, recently reduced from 40. And moderate to severe asthma and hypertension are identified as factors that *may* put a person at increased risk. Mills's medical records do not indicate the severity of his asthma, though they do indicate that he is regularly prescribed medication to treat it. In any event, the link between asthma and Covid-19 is complicated and not well developed—some studies show no increased risk and some do, depending on the type of asthma.[1] With respect to hypertension, a recent study noted that because hypertension is common among the elderly, and because older people are at particular risk from Covid-19, there may be no link between

---

[1] "Does asthma increase Covid-19 risk? Emerging research suggests a complicated connection." Stat News.

hypertension and severe forms of Covid-19 complications.[2] In sum, it is not entirely clear based on medical research and Mills's records whether his conditions place him at such a risk as to qualify as extraordinary and compelling circumstances for release. But the Court need not decide that question because even if they did, he still does not meet the criteria for compassionate release because of his dangerousness.

Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Mills has engaged in repeated violence—he has shot firearms at passing cars, brutally abused women, and continued to possess firearms over and over even though he is prohibited from doing so by law. His criminal sexual conduct conviction involves gruesome facts: when a friend declined to have sex with him, Mills told her "Yeah, I'll rape you if you don't give me some" and threatened "If you don't give me some p***y, I'll put your brother in intensive care, I already pulled a gun on him." (PSR ¶ 31). Mills proceeded to take off her pants and underwear and digitally penetrate her, even though she kept telling him to stop. (*Id*). Mills also slapped her and punched her on her face, called her a b***h,

---

[2] "Discussing COVID-19 and Hypertension," Medical News Today.

and choked her. (*Id*.). Another woman reported that Mills threw household items at her, grabbed her by her hair, and threw her on the ground before striking her with both a closed fist and open hand. (*Id.* at ¶ 34). Yet another woman reported that Mills choked her until she passed out after threatening "B***h I'll kill you!" (*Id.* at ¶ 38). Mills's pattern of beating, choking, and sexually assaulting woman, combined with his repeated possession of firearms, makes him a danger to the community. Studies have shown that the presence of a gun in domestic violence situations increases the risk of homicide by 500 percent.[3] Mills's dangerousness forecloses his compassionate release request.

## B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the

---

[3] C.Campbell, D.W.Webster, J.Koziol-McLain, et al., *Risk Factors for Femicide Within Physically Abusive Intimate Relationships*, 93 American Journal of Public Health 1089-1097 (2003).

Court were to find Mills eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of the offense involve a loaded firearm. Mills could have injured someone by fleeing from police at a high speed. He could have injured himself when he crashed into a building. Mills's history and characteristics also show a pattern of violent and dangerous behavior, as articulated in the section above. He has violated conditions of supervision over and over again, as he did here, which shows that he has not been deterred by past sentences of incarceration. The factors set forth in § 3553(a) do not support release.

### III.   If the Court were to grant Mills's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Mills's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Mills's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Amanda Jawad
Amanda Jawad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9116
Amanda.Jawad@usdoj.gov

Dated: July 15, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.


/s/ Amanda Jawad
Amanda Jawad
Assistant United States Attorney